IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANGELA H.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civil No. 19-cv-776-MAB |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.[2]

## Procedural History

Plaintiff applied for SSI in October 2016, alleging a disability onset date of March 14, 2013.  She later amended her onset date to November 8, 2016. After holding an evidentiary hearing, an ALJ denied the application in January 2019. (Tr. 15-26). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.   *See*, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*See*, Docs. 11, 27).

1

<u>**Issues Raised by Plaintiff**</u>

Plaintiff raises the following issues:

1.      The ALJ should have designated chondromalacia and a lumbar spinal condition as severe impairments.[3]

2.      The mental residual functional capacity (RFC) assessment was not supported by substantial evidence.

3.      The ALJ erred in weighing the medical opinions.

4.      The hypothetical question did not accurately reflect the RFC assessment.

<u>**Applicable Legal Standards**</u>

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[4] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other

---

[3] "Chondromalacia patellae, also known as 'runner's knee,' is a condition where the cartilage on the undersurface of the patella (kneecap) deteriorates and softens." https://www.healthline.com/health/chondromalacia-patella, visited on July 24, 2020.

[4] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. She determined that Plaintiff had not worked at the level of substantial gainful activity since the application date and had no past relevant work. She was born in 1973 and was 43 years old when she applied for benefits. The ALJ found that Plaintiff had severe impairments of obesity, cervical degenerative disc disease, schizoaffective disorder, depression, personality disorder, and history of polysubstance abuse.

The ALJ found that Plaintiff had the RFC to do light work limited to lifting, carrying, pushing, and pulling five pounds frequently and ten pounds occasionally; never climbing ladders, ropes, or scaffolds; occasionally crawling; and no more than occasional exposure to hazards such as unprotected heights. The ALJ also found mental limitations in that Plaintiff was limited to simple, routine, and repetitive work tasks involving only simple work related decisions; few, if any, workplace changes; no work with an assembly line or conveyor belt; and only occasional interaction with co-workers, supervisors, and the public.

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff was able to do jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

1.      **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in October 2018. (Tr. 34).

Plaintiff had been covered by health insurance since November 2016. (Tr. 37). She lived with her husband and her parents. (Tr. 40).

Plaintiff testified that she could not work "because of the voices and the hallucinations." It was hard for her to focus and being around people made her nervous. The mental health treatment she received at Chestnut helped but "not all the way." She saw a doctor for medication management once a month. She did not see a counselor. (Tr. 38-40).

Plaintiff said her neck and low back pain were both at about the same level. She indicated she had neuropathy in her feet and legs and sometimes fell. She had been using a cane for three years. She had difficulty standing because of back pain. Her neck was "very painful" and was sometimes so bad that she could not move her head to the right or the left. She was not taking pain medication at the time of the hearing because her doctor wanted to send her to pain management, but they were having a hard time finding a pain management specialist that would take her insurance. She was taking Gabapentin. She had not done any physical therapy and testified that "they didn't even say anything to me about it." According to Plaintiff, her doctor told her she had neuropathy because something was pinching her spinal cord. (Tr. 45-48).

Plaintiff was wearing a knee brace. She testified that an orthopedic doctor told her to wear it every day and only take it off to go to bed. (Tr. 56).

The ALJ asked the VE a hypothetical question which directed him to assume a

person who could "sit, stand and walk at the light exertional level, but lift, carry, push and pull at the sedentary level" along with the other limitations specified in the written RFC assessment. The VE testified that this person could do the jobs of hand packer, production worker, and cleaner. (Tr. 58-59).

### 2. Relevant Medical Records

An MRI of the lumbar spine in March 2016 showed no bulge or protrusion at any level except for L4-5. At that level there was diffuse disc protrusion with effacement of the thecal sac. (Tr. 321-322). An MRI of the right knee in June 2016 showed intact cruciate ligaments and normal menisci. There was small joint effusion with fluid extending into the suprapatellar bursa. (Tr. 317). Plaintiff was treated by a pain management specialist in 2016. She was administered injections for low back pain six times. (Tr. 306-313, 324).

While Plaintiff was at the hospital seeing her father in January 2017, she visited the emergency department to have her right knee looked at. She said she had been given injections in the past but had been unable to get pain medication since moving to Illinois. On exam, there was minimal swelling around the knee. She had a good range of motion. She was advised to use a knee immobilizer during the day and to follow up with her doctor in a week. (Tr. 347-348).

Harry J. Deppe, Ph.D., performed a consultative psychological exam in February 2017. Plaintiff said she was applying for disability because she had a hard time walking due to neuropathy. She was not taking any psychotropic medications. Dr. Deppe concluded that she had fair ability to relate to others. She had fair to good ability to understand and follow simple instructions, maintain attention required to perform

simple repetitive tasks, and to withstand the stress and pressures of day-to-day work activity. Her prognosis was fair to good. (Tr. 351-354)

The same month, Dr. Adrian Feinerman performed a consultative physical exam. Plaintiff said she had low back pain radiating into both lower extremities and right knee pain. She had been wearing a long leg brace on the right leg for two weeks. She was also wearing a back brace. She would not stand or walk without the leg brace and a cane. Range of motion of the spine was full. Sensory exam was normal. Straight leg raising was negative. Muscle strength was normal throughout, with no muscle spasm or atrophy. She was oriented, and her behavior, appearance, memory, concentration, and ability to relate were all normal. (Tr. 352-365).

Plaintiff saw PA LeMoine at BJC Medical Group Orthopedics and Sports Medicine for right knee pain in March 2017. X-rays showed mild degenerative changes. Her gait was normal. She was given a patellar stabilizing brace and was referred to Gateway hospital for twelve physical therapy sessions. She was to return to the office in two months. (Tr. 370-373). She did not attend PT or return to the office.

Plaintiff received primary health care at Southern Illinois Healthcare Foundation. She saw family nurse practitioner ("FNP") Vicki Young to establish care in December 2016. She told FNP Young that she was trying to get disability because of problems standing, walking, bending, and lifting, and because she had PTSD, paranoid schizophrenia, and major depression. On exam, she was five feet tall and weighed 180 pounds. She had an irregular gait and walked with a cane. She had tenderness of the hip and knee. She was anxious and depressed, but her memory was normal, and she was

7

oriented. She was to go to Centerstone that day to reestablish counseling and psychiatric care. (Tr. 332-336).

In February and May 2017, FNP Young noted tenderness in the knee on exam, along with depression and anxiety. As a result, she prescribed Hydrocodone. (Tr. 404-413).

Plaintiff saw nurse practitioner ("NP") Timothy Kamp at Southern Illinois Healthcare in July and October 2017. He noted tenderness in the knee, but also noted neurologic exam was normal and she had normal gait and station. (Tr. 396–404). In August 2017, an MRI of the lumbar spine ordered by NP Kamp showed mild facet arthropathy without significant disc disease and no significant central canal or neural foraminal stenosis. (Tr. 425).

Plaintiff received mental health care at Chestnut Family Health Center from March 2017 through August 2018.   She was seen by advance practice nurse ("APN") Jenia Heavens in March 2017 and reported that she had been without psychiatric medications for six months. She said she was having auditory hallucinations. On exam, her back was normal with a full range of motion. She was wearing a knee brace. She walked with a cane. Her gait was normal. Range of motion of the lower extremities was intact, with no swelling or deformity of the knees. Sensory exam was normal. Psychiatric exam showed good eye contact, full range of affect/positive mood, intact cognitive function, and logical, goal-directed thought process. (Tr. 437-439).

APN Miller saw Plaintiff at Chestnut for a psychiatric evaluation the next day. On exam, she was cooperative and alert. Eye contact was good. She had no deficits in

concentration. Her affect was restricted. Her gait was normal. Thought content was appropriate. She reported auditory and visual hallucinations. APN Miller diagnosed schizoaffective disorder, depressive type, and prescribed Prozac and Seroquel.  (Tr. 440-442). APN Miller saw Plaintiff seven times from April to November 2017. On each visit, Plaintiff was cooperative and alert with no deficits in concentration and normal gait. Her medications were adjusted as she continued to complain of hallucinations. (Tr. 444-460).

Dr. Jeffery Barra saw Plaintiff for routine follow-up at Chestnut in December 2017. He noted that she had missed several appointments. He reported no positive findings on physical exam except for scattered inspiratory wheezes. At her request, Plaintiff was referred to an orthopedic surgeon in Sauget for low back pain.  (Tr. 461-462).

In January 2018, Plaintiff told APN Miller that Prozac was working to manage her depression and her hallucinations were less. Her medication was adjusted. On exam, she was cooperative and alert. Eye contact was good. She had no deficits in concentration. Her affect was broad/full. Her gait was normal. Thought content was appropriate. (Tr. 466-467).

In March 2018, Plaintiff saw Dr. Bradley at Archview Medical Specialists for right knee pain. She was five tall and weighed 193 pounds. X-rays showed minimal degenerative changes and tiny intra-articular loose bodies. Dr. Bradley advised her that his office did not routinely give narcotic pain medication. He scheduled her for an MR arthrogram the next month. It does not appear that study was done. (Tr. 389-394).

In June 2018, Plaintiff complained to a nurse practitioner at Chestnut of chronic low back and right knee pain. The referral to the orthopedic surgeon had not been accepted because of confusion about the reason for the referral. On exam, she had no tenderness of the spine, and the exam was described as "normal exam of spine." She was using a cane. The nurse recommended PT and weight loss for her back pain. (Tr. 480-481). In August 2018, the nurse noted Plaintiff was dismissed from PT because she was "no call/no show at appointments." Physical exam was again normal. The nurse again prescribed Hydrocodone-Acetaminophen but said this would be the last pain medication given at this office. (Tr. 490-492). Three weeks later, the nurse noted that Plaintiff's insurance was accepted at St. Anthony's Pain Management, but the team there told the nurse they had informed Plaintiff they do not use opioid management, and Plaintiff had refused treatment. (Tr. 493).

APN Miller saw Plaintiff for management of her psychiatric medications five more times between February and August 2018. The findings on exam were as before. She continued to complain of hallucinations, and her medications were adjusted. (Tr. 468-473, 477-479, 487-489, 496-498).

### 3.    State Agency Consultants' Opinions

In March 2017 and June 2017, two state agency consultants assessed Plaintiff's mental RFC based on a review of the record. Both considered Dr. Deppe's examination as well as the other records obtained as of the time of their review. Both concluded that Plaintiff would have difficulty performing detailed activities of a complicated nature, but she would be able to perform simple, routine activities with reduced social demands.

10

(Tr. 98-100, 114-116).

### 4.    APN Miller's Opinion

In September 2018, APN Miller signed off on a checkbox form assessing Plaintiff's mental RFC. The signature of the person who completed the form is illegible. She indicated that Plaintiff had a number of extreme limitations, including ability to function independently, to regulate emotions and control behavior, ask simple questions or request help, and maintain socially appropriate behavior. The form asked for the objective signs and symptoms supporting the opinion. The answer given was "audio & visual hallucinations, paranoia, fear of the public & flat affect." (Tr. 501-504).

### Analysis

Plaintiff first argues the ALJ should have designated chondromalacia and her lumbar spinal condition as severe impairments at step 2 of the sequential analysis.

At step 2, the ALJ must determine whether the claimant has one or more severe impairments. This is only a "threshold issue," and, as long as the ALJ finds at least one severe impairment, she must continue on with the analysis. And, at step 4, she must consider the combined effect of all impairments, severe and non-severe. Therefore, a failure to designate a particular impairment as "severe" at step 2 does not matter to the outcome of the case as long as the ALJ finds that the claimant has at least one severe impairment.  *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012), citing *Castile v. Astrue*, 617 F.3d 923, 927-928 (7th Cir. 2010).

The ALJ explained that she did not consider Plaintiff's chondromalacia and lumbar spine condition to be severe impairments because the diagnostic studies showed

11

only mild degenerative changes in her lumbar spine and tiny loose bodies in her right knee; the conditions did not require specialized orthopedic care, PT, or prescription pain medication; physical exams of her spine were often unremarkable, her gait was steady, and sensory exams were normal; and none of her providers indicated the use of a cane was medically necessary. Further, Plaintiff denied that PT was recommended and claimed that she used a cane because of a pinched nerve in her back, but there was no evidence of a pinched nerve.   (Tr. 17-18).

Plaintiff takes issue with the statement that her back and knee did not require orthopedic care. She cites her treatment by "Timothy Kamp. M.D."   (Doc. 24, p. 7). This is incorrect; Mr. Kamp is a nurse practitioner, not an M.D. or an orthopedic specialist. In any event, he found Plaintiff had normal gait and station. Further, while Plaintiff's knee was evaluated by Dr. Bradley, the ALJ was correct in that she did not receive any ongoing treatment by an orthopedic specialist. Plaintiff points out that PT was prescribed, but that hardly cuts in her favor, since she never attended PT for her back or knee and testified at the hearing that PT had not been recommended.

Plaintiff was prescribed pain medication for some period of time. However, she was not taking pain medication at the time of the hearing and does not identify any evidence suggesting that her lumbar spine and knees cause any specific limitation that should have been accounted for in the RFC assessment. She suggests that she has "significant difficulties with standing and walking." (Doc. 24, p. 8). However, the ALJ's conclusion that the many normal physical exams demonstrate the opposite is supported by substantial evidence. Plaintiff points out that she received injections from a pain

management specialist, but that treatment predated the amended onset date.

As for her need to use a cane, Plaintiff argues that "her providers were never asked to comment on her need for a cane and the lack of a mention as to the necessity is not evidence supporting the conclusion it is not medically necessary." (Doc. 24, p. 6). This argument flips the burden of proof. It was Plaintiff's burden to demonstrate disability, not the ALJ's burden to disprove it.  A finding that a cane is medically required depends on medical documentation establishing "the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."   SSR 96-9p, 1996 WL 374185, *7. No such medical documentation was presented here. As Plaintiff was represented by counsel at the agency level, the ALJ was entitled to assume that she put on her best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

For her second point, Plaintiff challenges the mental RFC assessment.  Her argument is brief and nonspecific.  In essence, she argues the ALJ did not weigh the records of her treatment with APN Miller as she would weigh them. (Doc. 24, p. 9). This argument is a nonstarter. The ALJ acknowledged that Plaintiff continued to report auditory and visual hallucinations but pointed out that APN Miller consistently observed that Plaintiff was cooperative, with good eye contact, intact concentration and attention, stable mood, and logical and goal-directed thought processes. Further, APN Miller's records reflected improvement with medications. Moreover, the ALJ noted that, even when she had been without medications for six months, Dr. Deppe found Plaintiff

13

was oriented and showed good memory skills and reasoning ability. (Tr. 21-22). APN

Miller's records provide substantial support for the ALJ's conclusion that plaintiff can do

simple work with the mental limitations she assessed. This Court is not tasked with

reweighing the evidence.

Plaintiff next challenges the ALJ's weighing of the medical opinions. She argues

the ALJ erred in rejecting APN Miller's opinion and accepting the opinions of Dr. Deppe

and the state agency consultants.

Plaintiff assumes that APN Miller's opinion should be weighed as an opinion of a

treating source. (Doc. 24, p. 10). This is an incorrect assumption. APN Miller is not

considered an "acceptable medical source" for purposes of this case. 20 C.F.R. §

404.1502(a). Her report therefore does not constitute a "medical opinion." Rather,

"[m]edical opinions are statements from physicians and psychologists or other

acceptable medical sources. . . ." 20 C.F.R. § 404.1527(a)(1). It follows that APN Miller's

opinion is not entitled to any special weight under § 404.1527(c), the so-called "treating

source rule." SSR 06-03p, 2006 WL 2329939, at *2.

While APN Miller's opinion is not entitled to any special deference, the ALJ did

consider it. The ALJ is required to consider "all relevant evidence" and may, as

appropriate, consider the factors set forth in § 404.1527(c) in the process of weighing the

opinions of nonacceptable medical sources. SSR 06-3p, at * 4-5. The ALJ rejected APN

Miller's opinion because the checkbox form presented only conclusions with no

supporting rationale and the extreme limitations she assessed contradicted her own

observations as recorded in her treatment records. (Tr. 22). This analysis considered the

14

regulatory factors and is not erroneous.

Likewise, the ALJ's assessment of the opinions of Dr. Deppe and the state agency consultants was not error. Plaintiff argues that these opinions are not reliable because these psychologists did not review APN Miller's records. However, Dr. Deppe examined Plaintiff himself, and the state agency consultants reviewed Dr. Deppe's report. And, as the ALJ explained, their opinions were consistent with the later medical records documenting mostly normal mental status exams. (Tr. 23).

Plaintiff takes issue with the ALJ's view that the medical records document mostly normal mental status exams. Her brief features a chart listing dates on which dysphoric mood, hallucinations, and "paranoid" were mentioned in the Chestnut Health records. (Doc. 24, p. 12-13). However, this chart cherry-picks the records and ignores the normal mental status findings noted at these *same visits*.

The ALJ was not required to accept the accuracy of Plaintiff's subjective complaints, and Plaintiff has not challenged the weighing of her subjective allegations. Plaintiff claimed to be experiencing hallucinations, but APN Miller found no impairment of her ability to concentrate or pay attention. The ALJ was entitled to base her RFC assessment on the mental status exam results rather than on plaintiff's subjective allegations. Further, the ALJ assessed mental limitations, and Plaintiff points to no medical evidence suggesting that she cannot work with those limitations.

Lastly, Plaintiff argues that the physical RFC assessment was not supported because of a discrepancy between the written RFC assessment and the hypothetical question posed to the VE. The written RFC assessment limited plaintiff to lifting and

carrying five pounds frequently and ten pounds occasionally. (Tr. 20). The hypothetical question was more restrictive in that it asked the VE to *assume* she could only lift and carry at the sedentary level. The VE identified three jobs within the parameters of the hypothetical question. (Tr. 58-59).

The lifting and carrying requirements of sedentary work are "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a). Because the hypothetical question was more restrictive than the written RFC assessment, and the VE identified jobs within the more restrictive parameters, the discrepancy did not prejudice Plaintiff.

In the end, Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. She has not identified any error requiring remand. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court concludes that the ALJ committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

DATE: July 24, 2020

s/ Mark A. Beatty
MARK A. BEATTY
United States Magistrate Judge

17